```
             IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF OHIO
                        EASTERN DIVISION

Leslie Blaney,                    :

        Plaintiff,                :

     v.                           :       Case No.  2:15-cv-2449

Carolyn W. Colvin, Acting         :       JUDGE GEORGE C. SMITH
Commissioner of Social Security,          Magistrate Judge Kemp

        Defendant.                :
```

REPORT AND RECOMMENDATION

I. Introduction

Plaintiff, Leslie Blaney, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income. Her current applications (previous applications for the same benefits were denied on May 6, 2009) were filed on September 8, 2009 and alleged that Plaintiff became disabled on October 1, 2004.

After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge, and in a decision dated February 16, 2012, the ALJ issued a decision denying benefits. The Appeals Council granted review and remanded the case to the ALJ, who held another hearing on December 10, 2013. He again denied benefits in a decision dated February 21, 2014, and that became the Commissioner's final decision on April 24, 2015, when the Appeals Council denied review.

After Plaintiff filed this case, the Commissioner filed the administrative record on August 28, 2015, and supplemented the record with additional hearing transcripts in a filing made on February 10, 2016. Plaintiff filed her statement of specific errors on February 23, 2016, to which the Commissioner responded

on June 1, 2016.  Plaintiff filed a  reply brief on June 16, 2016, and the case is now ready to decide.

    II.   <u>The Lay Testimony at the Administrative Hearings</u>

The first hearing at which Plaintiff testified was held in connection with her prior application for benefits and occurred on April 21, 2009.  There, Plaintiff testified that she was born in 1966 (making her fifty years old as of the date of this decision) and that she had a high school diploma.  At the time of that hearing, she was receiving child support for three children and also qualified for food stamps.  One of her daughters who lived with her also had a child.  Plaintiff was employed at that time at a pizza shop where she worked between 20 and 25 hours per week.  She had earned about $10,000.00 in each of the two years preceding the hearing.

Before going to work at the pizza shop, Plaintiff had worked at a Taco Bell restaurant.  She also worked for a short time with Volunteers of America as a thrift store cashier.  Lastly, she worked for the Pickaway County Community Action Organization doing construction work like building wheelchair ramps and installing insulation.  She had lost several jobs due to attendance issues, which were caused by her health problems.

Plaintiff said that her most limiting impairment at that time was overall body weakness.  She also suffered from mood swings, slept about twelve hours per night, and also napped during the day.  She described difficulty being around others and said that stress made her angry.  Plaintiff also had anxiety which sometimes prevented her from leaving the house.  Additionally, she testified to constant abdominal and back pain.  Both walking and sitting made the pain worse.  She thought she could not lift more than ten pounds, could not be on her feet for more than three hours, and could not walk more than one block without resting.

When asked about medications, Plaintiff said she had been prescribed lithium and Xanax but stopped taking them because they did not improve her mood swings.  She had used street drugs and alcohol in the past as a way of self-medicating but no longer did so.  She did some cooking and cleaning as well as laundry.  (Tr. 1109-32).

The next hearing was held in April, 2011, in connection with the current application for benefits.  Plaintiff told the ALJ she had not worked since September 3, 2009, and had not looked for work since then.  She was still having back problems, anxiety, anger, depression, and stomach problems, and also reported swelling in her legs and recurring outbreaks of shingles.  Her condition had worsened since the prior hearing, and she had to use a walker more and needed help with personal care.  Her anxiety attacks occurred daily and she used inhalers for asthma several times a day.  She was unable to use the stairs in her home.  She left home only to go to medical appointments.

On a typical day, Plaintiff would crochet, color, and do puzzles with her grandchildren.  Her daughter did most of the household chores.  There were days when Plaintiff's pain was so excruciating that she was unable to move.  (Tr. 1052-75).

A third hearing was held several months later, on November 30, 2011.  There, Plaintiff testified that since the previous hearing she had gone to a liver specialist (she has hepatitis C) and undergone a breathing test.  She was also going to be sent for cardiac evaluation.  She had to elevate her legs due to swelling.  When she left her house, she walked with a cane. Finally, she said she had never gone a full week without having a day when she was crying or exhausted.  (Tr. 1088-94).

The last of the four administrative hearings was held on December 10, 2013.  Plaintiff was first asked about her job with the Pickaway County Community Action Organization.  She testified

-3-

that she did mostly weatherization and renovation work, including pouring concrete and welding.  She said that her back was worse, and also that she had urinary incontinence.  She was still elevating her legs on a daily basis.  She also expressed feelings of hopelessness at the hearing and said she spent most of her time in bed sleeping.  (Tr. 59-70).

### III.  The Medical Records

The medical records in this case are found beginning on page 374 of the administrative record.  The pertinent records - those relating to Plaintiff's psychological conditions - can be summarized as follows.

It is important to preface this summary by referring to certain findings made by the ALJ who decided Plaintiff's earlier claim.  He concluded that Plaintiff had the following mental residual capacity: she could understand, remember, and carry out simple instructions and could deal with routine changes, and she was also capable of interacting with others on a superficial basis.  However, she was "unable to attend or concentrate for eight hours to a task that allows no variability in the workplace."  Lastly, she could not deal with a work setting where frequent supervisory interaction was required although she could tolerate routine instructions and criticism. (Tr. 102).  Both state agency psychologists who reviewed Plaintiff's current application - Drs. Tangeman and Marlow - adopted that mental residual functional capacity finding.  (Tr. 741, 757).  Those evaluations of the record were done in 2010.

The ALJ focused on the medical evidence which post-dated the prior decision.  He cited to Exhibits 29F, 33F, 30F, 31F, and 32F as evidence of changes in Plaintiff's condition since 2009, and also discussed extensively the consultative report of Dr. Donaldson and treatment notes found at Exhibit 34F.  Exhibits 29F and 33F relate to Plaintiff's physical impairments, and Exhibits

30F, 31F and 32F are the reports from Drs. Tangeman and Marlow, which have already been discussed, and which adopted the prior mental RFC. Exhibit 34F, however, consists of 35 pages of treatment notes. Here is, briefly, what those notes say.

Plaintiff was seen on March 4, 2010. She said the last two months had not been good and that she had almost no motivation. She was sleeping a lot. Plaintiff said she had taken Abilify for 2-3 months but it did not help her. She was started on Risperdal. Her next appointment was four months later, when she said she had been doing fairly well until recently and that she had gone to Netcare for help. Her sleep was "ok" and she asked to try Ritalin for her ADHD. In August of 2010, she said that the Ritalin had helped her and that she was having more good days. Her Ritalin dosage was increased. In October, 2010, she appeared discouraged and upset, but had run out of medication. The prior month, she told her regular doctor that her mood was not so bad and that she was not depressed unless she forgot her medications. The only thing of significance noted on a January 20, 2011 note was that she was afraid to go out because she lived in a scary neighborhood. (Tr. 759-94). It is worth noting that at the Netcare assessment which Plaintiff reported, she was given a GAF of 28, and she stated that she "wishe[d] she were not here anymore" although she did not have a specific plan to harm herself. She reported a continual depressed mood, poor appetite, and staying in bed all day. (Tr. 814-21).

Dr. Donaldson performed his consultative evaluation on May 10, 2011. He described Plaintiff as agitated but cooperative. She was attending counseling every other month. Her affect was anxious and depressed but she denied compulsive or impulsive behavior. She reported problems with sleeping and with her appetite and said she cried daily. Dr. Donaldson diagnosed major depressive disorder and generalized anxiety disorder and rated

Plaintiff's GAF at 45. He thought she had some limitations due to her disorders but not in the area of understanding, remembering, and carrying out one- or two-step job instructions. None of her limitations were more than moderate and he attributed at least some of them to chronic pain, Plaintiff's educational level, and her intellectual ability.  (Tr. 822-28).  In an addendum to his report, Dr. Donaldson stated that her GAF rating had been based on a number of factors other than diagnosed mental impairments, including unemployment, inadequate finances, criminal history, medical problems, and history of substance abuse.  (Tr. 847).

### IV.  The Vocational Testimony

Vocational testimony was taken at several of the administrative hearings, but the Court will summarize only the testimony given at the most recent hearing.  At that hearing, George Coleman III was  called to testify as a vocational expert.  His testimony begins at page 70 of the administrative record.

Mr. Coleman described Plaintiff's past employment as a construction laborer as unskilled and usually done at the very heavy exertional level, although it was a medium strength job the way Plaintiff performed it.  He was then asked if someone who could work at the light exertional level, who could crouch and stoop frequently, who was limited to the performance of simple, repetitive tasks in a static work environment where there were infrequent changes and duties of process that did not require more than occasional contact with others, and who could maintain attention and concentration for only two-hour segments, could do that job.  He said that such a person could not do so.

Next, Mr. Coleman was asked if there were other jobs which someone so limited, and with Plaintiff's background, could perform.  In response, he identified jobs like mail room clerk, presser, and routing clerk.

As part of a second hypothetical question, the ALJ described someone who, again, could work at the light exertional level, but who could not sit more than three hours at a time, stand more than three hours in a day (and only one hour at a time), or walk for more than two hours in a day (and, again, only one hour at a time).  The person was limited to occasional overhead reaching, pushing, and pulling and could not climb ladders, ropes, or scaffolds or be exposed to extreme cold or atmospheric pollutants.  The person could occasionally be exposed to unprotected heights, dangerous machinery, humidity and wetness, extreme heat, and vibrations.  Finally, the person could do only simple, repetitive tasks with only occasional contact with others.  Mr. Coleman said that such a person could not do any light jobs, but at the sedentary level, he or she could be a table worker, address clerk, or cutter of press reports or newspaper articles.  Only about 374 of these three jobs existed in the regional economy, although there were over 60,000 such jobs nationally.  Mr. Coleman did note that these were representative positions, and he estimated that the person described in the question could do a percentage of the 4,800 unskilled sedentary jobs in the regional economy (although it is not clear if he said that percentage was one-third or two-thirds).  Adding the previous limitation about working in a static environment would not alter his conclusions.

Next, Mr. Coleman was asked to consider limitations set out in the report from the Ohio Department of Job and Family Services.  He said that someone with those limitations could not be employed.  He was then asked how needing to alternate between standing and sitting affected employability, and said that it would depend on whether alternating positions put the worker off task or distracted others.  Changing positions every fifteen minutes usually required accommodation from the employer.

Mr. Coleman was also questioned by Plaintiff's counsel about what a limitation to simple, repetitive tasks meant. He agreed that there was no variability in such work. Also, he said that elevating legs above heart level, or even to 90 degrees, was not consistent with employment, and the same was true for more than four to eight hours a month of absenteeism.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 18-43 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the special earnings requirements of the Social Security Act through June 30, 2013. Next, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of October 1, 2004. Going to the second step of the sequential evaluation process, the ALJ concluded that Plaintiff had severe impairments including degenerative disc disease, ovarian cysts, bipolar disorder, anxiety disorder, polysubstance abuse, persistent lower extremity edema, obesity, hepatitis C, asthma, fibromyalgia, and diabetes mellitus. The ALJ also found that these impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to step four of the sequential evaluation process, the ALJ found that Plaintiff had the residual functional capacity to lift and carry at the light exertional level, but she could not sit more than three hours at a time, stand more than three hours in a day (and only one hour at a time), or walk for more than two hours in a day (and, again, only one hour at a time). She was limited to occasional overhead reaching, pushing, and pulling and could not climb ladders, ropes, or scaffolds or be exposed to extreme cold or atmospheric pollutants. She could

occasionally be exposed to unprotected heights, dangerous machinery, humidity and wetness, extreme heat, and vibrations. Finally, Plaintiff could do only simple, repetitive tasks in a relatively static work environment where there were infrequent changes to duties or processes and where she would have only occasional contact with others.  With these restrictions, the ALJ concluded that although Plaintiff could not perform her past relevant work, Plaintiff could perform the sedentary jobs identified by the vocational expert, including table worker, addresser, and cutter/paster, and that jobs like these existed in significant numbers in the regional and national economies. Consequently, the ALJ determined that Plaintiff was not entitled to benefits.

      VI.   Plaintiff's Statement of Specific Errors

In her statement of specific errors, Plaintiff raises these issues: (1) the ALJ erred by failing to apply the prior ALJ's mental RFC finding in the absence of proof that her mental condition had improved since the time of that decision; and (2) the ALJ did not properly consider and weigh the state agency reviewers' opinions about Plaintiff's mental health functioning. These issues are evaluated under the following legal standard.

Standard of Review.  Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)).  It is "'more than a mere scintilla.'" Id.  LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976).  The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th

Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984).  In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985).  Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence.  Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

    Plaintiff's two statements of error, though stated separately, are sufficiently related that the Court may discuss them together.  Plaintiff begins by noting that the Court of Appeals, in Drummond v. Comm'r of Social Security, 126 F.3d 837, 842 (6th Cir. 1997), held that under the doctrine of administrative res judicata an ALJ is required to adopt the findings of a prior ALJ "[a]bsent evidence of an improvement in a claimant's condition ...."  This requirement has been incorporated into Acquiescence Ruling 98-4(6).  She then points out that in Section 1-5-4-62 of the Social Security Administration's Hearings, Appeals and Litigation Law Manual (HALLEX), guidance is provided about how to implement the Drummond ruling.  In pertinent part, that guidance states that a finding of improvement must be based on evidence that is both "new" and "material."  In this context, "new" simply means evidence not presented to the prior adjudicator.  "Material" evidence is evidence that "both differs from that presented in the prior claim and warrants a finding different than that made in the decision on the prior claim."  Additionally, the ALJ's decision "must refer to the AR [Acquiescence Ruling 98-4(6)] and include rationale indicating why any new evidence is or is not

-10-

material to a particular finding."

According to Plaintiff, although the ALJ said that there was new evidence which allowed him to make a different finding as to Plaintiff's mental residual functional capacity, he never explained why that evidence was material and warranted such a change. In addition, Plaintiff argues, he did not adequately explain why he gave little weight to the opinions of Drs. Tangeman and Marlow, both of whom agreed with the finding made by the prior ALJ concerning Plaintiff's mental residual functional capacity. Relying on the fact that prior vocational experts testified that, with those restrictions - specifically, the inability to focus on simple, repetitive, and unchanging tasks for eight hours - are work-preclusive, Plaintiff contends that, at a minimum, the case should be remanded for further consideration of whether there is new and material evidence warranting a departure from the prior ALJ's finding.

The Commissioner does not disagree with Plaintiff's summary of the applicable law. However, the Commissioner argues that the ALJ spent six pages of his decision discussing all of the new evidence which post-dated the prior ALJ's decision and reasonably concluded that it showed improvement in her mental condition. In particular, the Commissioner points to evidence that a prescription for Ritalin improved Plaintiff's ability to concentrate and that most of the records showed that Plaintiff's primary complaints were about physical, rather than mental, impairments. In the Commissioner's view, Dr. Donaldson's evaluation, which also post-dated the prior decision, provides further support for the ALJ's findings. Finally, the Commissioner argues that this new evidence also provided ample support for the ALJ's decision to give only little weight to the opinions of Drs. Tangeman and Marlow.

In the introductory portion of his decision, the ALJ cited <u>Drummond</u> and AR 98-4(6) and correctly explained the applicable

law. He then stated his conclusion - that "the current record ... indicates a change in her mental status as compared to her condition at the time of the prior decision. Such changes therefore provide a basis for a different finding as to the severity of the claimant's impairments and residual functional capacity." (Tr. 23). As noted above, the ALJ then identified one exhibit, the 35 pages of treatment notes, as containing that new evidence showing improvement.

According to the ALJ, the post-2009 record showed that Plaintiff "received sporadic and inconsistent treatment for bipolar disorder and anxiety." (Tr. 35). Increases in her symptoms were only "temporary" and the records "generally fail to document consistent abnormal mental status examinations." Id. There were instances of noncompliance with treatment and gaps in her treatment history. (Tr. 36). The notes did not document objective findings and Plaintiff "apparently had improvement in concentration with Ritalin ...." Id. Further, her psychiatrist "failed to routine (sic) document serious mental impairment or abnormalities." Id. The ALJ also noted that Dr. Donaldson's report documented an ability to function in various areas; that is, "[t]he credible, objective evidence, such as the findings of consultative psychologist Dr. Donaldson, does not support serious limitation in the claimant's functioning." (Tr. 36).

A careful reading of Plaintiff's statement of errors shows that Plaintiff does not dispute that the ALJ accurately summarized the evidence of her post-2009 treatment for mental impairments. She does not argue, in so many words, even that the record would not support a finding of improvement in her mental condition. Rather, to quote her brief directly, she asserts that the ALJ "never explained which new and material evidence supported a finding of a 'change,' what the 'change' was, nor did he explain his rationale for redetermining the entire mental health portion" of the prior decision. Statement of Errors, Doc.

-12-

21, at 9.  She characterizes the decision as a "bald, unexplained assertion that [the] claimant's condition has 'changed'" and argues that the ALJ has deprived the Court of the ability to conduct a "meaningful review" of the decision.  Id.  In other words, she makes an argument based on the alleged failure to articulate an adequate basis for the ALJ's decision, rather than an argument that the decision he reached does not have substantial support in the record.  To be fair, she makes a brief statement in her reply (Doc. 27) that the record does not support the ALJ's decision, but that argument is not fleshed out in any meaningful way.

    The Court cannot accept Plaintiff's characterization of the ALJ's decision.  The ALJ correctly articulated the governing legal standard and stated that his decision was based on new evidence showing an improvement in Plaintiff's medical condition.  His review of the post-2009 records, which he cited as the basis of his decision, shows that he gave various reasons for concluding that Plaintiff's mental condition was not as serious as it was when the prior ALJ made his decision.  He did so in a way that permits this Court to understand the basis for his ruling, and, to the extent that Plaintiff has raised the issue of substantial evidence, in a way that finds support in the record.  In particular, the issue which Plaintiff has focused on is her alleged inability to concentrate on repetitive tasks, but the ALJ specifically cited to treatment records showing that she had been prescribed Ritalin for her ADHD and that she had improvement in that area.  Given this record, the ALJ was justified both in finding that there had been improvement - the prerequisite for avoiding the res judicata effect of the prior decision - and that the prior state agency reviewers' opinions, which did not factor in this evidence, were entitled to little weight.  Under these circumstances, the Court finds no merit to either of Plaintiff's statements of error, and will recommend that they be overruled.

## VII. Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Defendant Commissioner.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a _de novo_ determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation _de novo_, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge